Per Curiam: :
This case was referred pursuant to former Rule 45(a) (now Rule 57(a)) to Trial Commissioner Herbert N. Maletz with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on October 30, 1964. The plaintiff has excepted to the opinion and certain of the findings of fact. The parties have filed briefs and the case has been argued orally. Since the court agrees with the commissioner’s findings, his opinion and his recommended conclusions of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. This result is in accord with and is supported by the recent decision of the 9th Circuit in United States v. Howe, 349 F. 2d 483 (1965). Plaintiff is therefore not entitled to recover and the petition is dismissed.
Opinion oe Commissioner
Plaintiff, an individual who was owner and operator of the “Club Del Mar” in Santa Monica, California, sues to recover excise taxes which he paid on monthly membership dues and members’ annual locker rental charges for the period from January 1, 1959 to October 31, 1960. Such taxes were assessed under section 4241 (a) (1) of the Internal Revenue Code of 1954 which imposes: “A tax equivalent to 20 per cent of any amount paid as dues[1] or membership fees to any social, athletic, or sporting club or organization, if the dues or fees of an active resident annual member are in excess of $10.00 per year.”[2] The principal issues as *1161 stipulated by the parties are (1) whether the Club Del Mar was a club or organization within the meaning of the section; (2) if so, whether it was a “social, athletic, or sporting club or organization”; and (3) whether, in any event, refund is barred by section 6415 of the Code.[3]
The Club Del Mar was built in 1926 and was acquired by plaintiff in 1958. The property consisted of a main building of six stories, bearing in front the title “Del Mar Hotel and Club”, and an adjacent private beach fronting on the Pacific Ocean. On the lobby floor (which was the third floor of the building) were a hotel registration desk, a hotel office, a reception desk, a gift counter and shop, a club office, a large club lounge, two banquet rooms, a large ballroom which also served as a restaurant, and another restaurant and bar overlooking the ocean. On the fourth floor was another banquet room. On the remainder of the fourth floor and on the fifth and sixth floors were hotel rooms numbering 120 in all.
On the second floor of the building (i.e., the floor below the lobby), there was a laundry and ladies’ locker rooms. The floor below that (which was the ground floor from the beach side) had a large Olympic-size indoor swimming pool; men’s locker rooms; a men’s and a women’s gymnasium each containing various kinds of apparatus used for physical exercise and conditioning; storage areas; and a beauty shop and barber shop. The swimming pool had a balcony which was part of the second floor.
The private beach, which was connected to the main building by an underpass running beneath a public way, was 'bounded by fences along two boundaries and by a cafeteria and paddle tennis court fences along the third. The remaining boundary of the beach was unfenced and bordered on a public beach belonging to the State. Signs reading “Club Del Mar” were placed along the open line of the club beach and efforts were made to keep members of the general public *1162 out therefrom. Club facilities on the beach consisted of the cafeteria, a restaurant, volleyball and paddle tennis courts, and a children’s playground.
The facilities of the Club Del Mar were not open or held out as open to the general public except for the beauty shop and barber shop which had entrances both on the street and inside the premises. Concessionaires operated- these shops and had instructions to restrict their outside trade from entering into the other areas of the property. In the event an outside customer desired to go into such areas, the concessionaire was required to call a membership salesman to take him through.
As a further means of controlling access to the club’s premises, persons coming into the lobby from the street were stopped and asked to indicate why they were there. However, the club’s facilities were not limited to club members and their guests. Any person could rent a hotel room (a 10%' discount therefor being granted to members) and by doing so have, during the period of his stay, the use of all the facilities and beach on the same basis as members. Further, anyone, whether a member of the club or not, could arrange for the use of various of the club’s facilities for luncheons, cocktail parties, wedding receptions, fashion shows, charity benefits, business affairs, etc. Those putting on such, functions could invite anyone they wished, whether members or not, and once on the premises those attending such affairs could go anywhere they pleased in the facility, although as a practical matter the beach facilities were used mainly by club members and hotel guests. At least one-third of the food and beverage business in the facility came from banquets and affairs given by outside organizations, while the other two-thirds of that business was obtained from members, members’ guests, hotel guests and guests of hotel guests.
Various services in the club were provided by concessionaires, which services included (in addition to those provided by the beauty and barber shops) dancing, bridge and swimming lessons, and massages. One did not have to be a dub member to obtain these services; however, most concessionaire customers (other than those using the beauty and barber shops) were, in fact, either club members or persons who *1163 would very soon become such.. In the event a member of the general public came into the lobby from the front entrance for purpose of obtaining the services of a concessionaire, he would be directed to that concessionaire and at the same time solicited to become a member of the club. In the time a concessionaire’s customer was on the club’s premises, he could have the run of its facilities.
During the period in issue, the Club Del Mar engaged in an extensive membership campaign consisting, among other things, of newspaper advertisements and mail-outs, which included copies of the club magazine “Club Del Mar Life’’ and membership application blanks. The promotional literature, as well as the application blanks, represented that the Club Del Mar was an all-year family beach club with recreational and social activities for the whole family and possessing the following features: the most beautiful private beach in the world; health facilities; men’s and ladies’ gyms; steam rooms; Olympic-heated pool; tennis courts; children’s playground; recreation; dinner dancing Friday, Saturday and Sunday with name bands; teen-age parties; bridge and dance lessons; and excellent food at modest prices. In addition, thousands of folders were mailed out with a courtesy guest card attached to each entitling the bearer and his party to one day’s use of facilities on the same basis as a member. Other persons were also allowed to use the club’s facilities on a trial basis for a day, although such persons were encouraged to obtain a guest card. Plaintiff, however, discouraged anyone from using the private beach and other athletic and health facilities on a day-by-day basis for a fee.
As part of the promotional effort, some ten to twenty salesmen were employed to solicit club memberships. This they did by analyzing the family’s needs, pointing out the facilities such as beach, gymnasium, etc., which were available for each member of the family, and indicating that the club had dinner dancing, fashion shows, etc. New members were also obtained through current members by offering the latter cash incentives, free tickets to an honor roll ball, and prizes for those who brought in the most members, such as trips to Hawaii, television sets, etc.
*1164 For purpose of promoting the hotel business, plaintiff also distributed a brochure to travel agencies throughout the country. The brochure entitled “The Del Mar Hotel and Kestaurant” gave the same address as the Club Del Mar and contained a detailed description of the hotel and club premises, including the gymnasium and beach.
During the pertinent period the initiation fee for a family membership was $100.00 for all but several months, while the monthly dues were $12.00, which dues were the same regardless of the number of times the facilities were used. Some advertisements stated that the monthly dues were $12.00 including tax; other advertisements stated that the monthly dues were $10.00 plus tax. The membership application blanks stated that monthly dues were $12.00 “including federal tax” or which “includes federal taxes”. In addition to the monthly dues, members using the swimming pool or beach were required to use a club locker for which (during most of the relevant period) there was an annual rental charge of $24.00. The club’s “Locker Koom Kules” (which were contained in the by-laws) specified in this connection •that the “Members’ annual locker fees * * * are $20.00 annually plus tax.” The monthly dues and the annual locker rental were accounted for on the club’s books as follows (as plaintiff was aware) : (1) of the $12.00 dues, $10.00 was allocated to club dues income and $2.00 to excise tax liability; (2) of the $24.00 locker fee, $20.00 was allocated to locker rental income and $4.00 to excise tax liability. The bills sent to members for dues or locker fees never contained a separate charge for taxes, nor otherwise referred to taxes; they referred to the full amount billed as dues, or locker fees, as the case might be. The same was true of the ledger account of each member.
In the years here relevant, the Club Del Mar had as many as 1,000 dues-paying members and a membership turnover of one-fourth to one-third a year. It also had some 500 courtesy or “C” members, consisting of persons who, plaintiff felt, could be of promotional assistance to the club’s business. “C” members paid no dues, but rather were billed only for food and other day-to-day items they purchased at the club. It was the plaintiff’s objective to have a closed *1165 membership — which he estimated would require from 2,500 to 3,000 members — so as to provide a profitable operation and prevent the continuous expenditures for acquisition of new members.
One applying for membership had to fill out the membership application blank which, among other things, required him to give social and financial references. The latter references were checked to determine the extent of credit the applicant would be allowed at the club’s facilities. Credit was also granted to persons who were not members but who might be the source of hotel, banquet or restaurant business in the facility. In addition, credit cards were issued to persons who were good customers of the restaurant or bar but did not want to become club members; such cards were not, however, issued to persons who wanted them merely to use the club’s beach, pool or gym. While a credit card was good on its face only for rooms, restaurant and bar, there was nothing to stop a holder once on the premises from using all the club’s facilities, although there is no evidence that such holders actually used the beach, pool or gym to any significant extent.
The membership application blank which the applicant was required to sign specified that if he were accepted as a member he agreed to abide by the club’s by-laws. On becoming, a member the applicant received a copy of the by-laws and the club’s rules and regulations, together with a letter of acceptance signed by “T. D. Harter, President” stating in part that it was hoped the member would participate in the club’s “many social and recreational activities.” The by-laws provided that the objectives of the Club Del Mar were “To maintain, conduct and operate an exclusive family club in. the best social traditions; also to develop a community spirit, goodwill, sociability and friendship among and to promote the physical and social welfare of its-members'and their-families and guests.” The by-laws also provided that “members shall not be personally liable for any debt or financial, obligation of the Club”; that “Membership does not entitle, members to any voting rights”; that the “Membership Com-' mittee shall be appointed by the Board of Directors or owners” ; that the “Membership Committee shall have the full-, *1166 authority to act on applications for membership”; that its “actions shall be considered final subject only to review by the Board of Directors or owners”; and that it “shall have the power to cancel and terminate any Membership at any time and for any reason that it may deem proper.”
Although the by-laws, application blanks and advertisements referred to T. D. Harter as president, to the membership committee and to the Board of Directors, in actuality, Harter was an employee of plaintiff, there was no membership committee, and there was no Board of Directors. Instead, plaintiff alone approved membership applications and it was he who in effect was the membership committee. • None of the members had any authority in the operation of the property, nor any right of approval or other control in respect of the applications for membership. Plaintiff’s checks were signed by him or his executive director and from time to time the club literature included the name of plaintiff as “owner”. Plaintiff alone fixed the entrance fees, due and locker fees, and his purpose in operating the club was to make a profit. However, during the years in issue plaintiff incurred losses in the operation of the club and hotel, and such losses were borne by him, not by the members. Nor did the members bear any of the expenses incurred in the operation of the facilities. Plaintiff did not deal in any respect with any group of members; rather, his relation was directly with each member separately. The members had no organization of any kind or any committees; nor did they get together in any meeting,'as members.
The Club Del Mar had frequent social events, such as parties on Halloween, Thanksgiving, Christmas and New Year’s; dinner dancing on Fridays, Saturdays and Sundays; luaus; family dinners; fashion shows; etc. The functions were announced in a magazine entitled “Club Del Mar Life” which the club issued periodically and sent to members and also to prospective members; On occasion, too, some of the club’s social events were listed in a brochure sent to members, prospective members, hotel guests and business houses. Those attending club parties were usually members, members’ friends, and persons connected with the same business concerns as members. If a member of the general public came *1167 into the club to attend a party, he would be asked how he happened to come in; if he was presentable, he would be allowed to enter, and at the same time his name and address would be taken on the assumption that he would be a prospect for membership. The dinner dances given by the club on Friday, Saturday and Sunday evenings were not, except for a period of some three months in 1959, open to the public or advertised 'as such.
Free movies were given at the club on Saturday afternoons for club members and prospective members and their children. Also, considerable attention was given to other activities for children of members. Thus the club held teen-age dance parties, a children’s Easter party, and children’s competition of various kinds, including paddle tennis and volleyball tournaments, and pool and ocean swimming events.
The club sponsored athletic competitions between its members on the Fourth of July, Labor Day and other holidays. These competitions, which were limited to members, included paddle tennis, volleyball and shuffleboard tournaments, and swimming races in the pool and ocean for children. A person who had been designated as the club’s athletic director assisted the members in forming teams for the swimming events; he also organized a club swimming team which represented the club in various competitions with other teams.
The Club Del Mar had affiliation arrangements with some 38 other clubs which provided for reciprocal visitors’ privileges for their respective members, and in accordance with such arrangements, it issued visitors’ cards to various of its members enabling them to visit affiliated clubs.
Plaintiff filed excise tax returns for December 1958 and the first quarter of 1959, but not thereafter until visited by a revenue agent in August 1960. As a result of, and on the day of this visit, plaintiff wrote to the Internal Eevenue Service giving various reasons for his failure to file such returns. In December 1960, plaintiff filed a club dues tax return covering the period from January 1, 1959 through October 31, 1960, in the amount of $70,076.06, which “tax” (he stated) “has been collected by me from members of the Club Del *1168 Mar.” He enclosed a check for $2,500 and suggested an installment method for paying the remainder. Following the filing of liens against plaintiff, the total tax assessment was paid for which (except for a portion barred by limitations) recovery is sought here.
The first problem, against this background, is to determine whether the Club Del Mar was a “club or organization” within the meaning of the section. While there is no statutory definition of these terms, it would seem they envisage an association or a substantial commingling of a defined group of individuals for a common purpose pr objective. Bunker Hill Country Club v. United States, 80 Ct. Cl. 375, 384, 9 F. Supp. 52, 56 (1934), cert. denied 296 U.S. 583 (1935); Chattanooga Automobile Club v. Commissioner, 182 F. 2d 551, 554 (6th Cir., 1950); Arner v. Bogan, 27 AFTR 1092, 1095 (S.D. Cal., 1940). See also G.C.M. 23688, 1943-Cum. Bull. 283, 286; Rev. Rul. 58-589, 1958-2 Cum. Bull. 266, 267. Whether these features are present or not depends not on the instrumentality’s name but on its purposes and actual operations. Neither the corporate charter nor the by-laws are decisive in this connection; they are merely part of the evidence which must be considered in conjunction with all other pertinent factors. See e.g., Cosmos Club v. United States, 70 Ct. Cl. 363, 42 F. 2d 321 (1930); Union League Club v. United States, 78 Ct. Cl. 351, 4 F. Supp. 929 (1933); Town Club of St. Louis v. United States, 68 F. 2d 620 (8th Cir., 1934); Century Club v. United States, 81 Ct. Cl. 878, 12 F. Supp. 617 (1935); Furniture Club of America v. United States, 67 F. Supp. 764 (N.D. Ill., 1946); Arkwright Club v. United States, 127 Ct. Cl. 247, 117 F. Supp, 411 (1954); Gould v. United States, 187 F. Supp. 337, 340 (D. Col., 1960). In this light, the evidence as a whole leads to these conclusions : the Club Del Mar’s members were afforded opportunity to associate together for the common purpose of using and enjoying the club’s facilities and participating in its social, recreational and athletic activities; there was substantial commingling among members in these respects; the members, made themselves subject to rules and regulations in their conduct and use of the club’s facilities; they could use the *1169 club’s facilities for as many or as few times as they wished for an initiation fee, prescribed monthly dues and annua! locker rentals; and they composed a group distinct and apart from the general public in these various respects. Bunker Hill Country Club v. United States, supra, p. 384. See also Rev. Rul. 63-3, 1963-1 Cum. Bull. 258, 259.
It is true that the Club Del Mar’s facilities were not limited to members, but this in itself does not change the members’ liability for the tax,[4] it being sufficient that the facilities were not open, without limit, to the general public. United States v. Anderson, 108 F. 2d 475, 479 (7th Cir., 1939); Shaw v. United States, 11 AFTR 2d 2020, 2023 (E.D. Mich., 1963).
Plaintiff maintains, however, that the dues tax is applicable only to non-profit dubs or organizations (i.e., membership-owned, controlled and financed) of the kind exempt from income tax by section 501(c) (7) of the 1954 Code.[5] However, the principle is established in this court that the dues tax applies equally to profit and non-profit clubs or organizations, and irrespective of whether or not the members have property rights in the organization or bear liability for assessment. Bunker Hill Country Club v. United States, supra. To similar effect the court stated in Shaw v. United States, supra (p. 2023): “Though the Statute pro *1170 vides for certain exemptions from the tax, there is no provision which would exclude profit-making organizations pr organizations that are operated informally. It would therefore appear that Congress did not intend to exclude this type of organization from the tax, or it would have specifically said so.” [6] Likewise, it has been the published position of the Internal Eevenue Service since 1925 that the applicability of the tax is not affected by the fact that the club or organization is operated for profit or that the member making the payment may not participate in the management. See S.T. 457,1925-1 Cum. Bull. 296, and its recent re-affirmance in Eev. Eul. 63-3,1963-1 Cum. Bull. 258. The Service’s “substantially contemporaneous expressions of opinion are highly relevant and material evidence of the probable general understanding of the times and of the opinions of men who probably were active in the drafting of the statute.” White v. Winchester Country Club, 315 U.S. at 41.[7]
*1171 From the foregoing, the necessary conclusion is that the Club Del Mar was a “club or organization” within the meaning of the dues tax section of the Code. But this, of course, does not end the inquiry inasmuch as the dues tax is imposed only if the club or organization is a “social, athletic, or sporting” one. Many cases in this court make it clear that to constitute a club or organization of this nature, the social, athletic or sporting activities must represent an important and material part of the organization’s operations and not be merely incidental to its other activities.[8] Consistent with this, the Treasury regulations provide in part:[9]
(e) Social, athletic, or sporting chib or organization— (1) In general. The purposes and activities of a club or organization, and not its name, determine its character for purposes of the tax. Every club or organization which has a membership of individuals or family units and which has social, athletic, or sporting features is presumed to be a social, athletic, or sporting club or organization, until the club or organization has satisfied the district director that it is not in fact a social, athletic, or sporting club or organization within the meaning of the regulations in this part. * * *
(2) Social chibs or organizations. Any club or organization which maintains quarters, or arranges periodic dinners or meetings, for the purpose of affording its members an opportunity of congregating for social intercourse is a social club or organization within the meaning of the regulations in this part, unless its social features are not a material purpose of the organization, but are *1172 subordinate and merely incidental to the active furtherance of a different and_ predominant purpose, such as religion, the arts, or business. * * *
Here the record demonstrates that social activities of the Club Del Mar, such as dances, parties, family dinners, fashion shows, athletic competitions, etc., were a prominent and material feature of its activities. What is more, such social activities not only tended to make membership therein more desirable, they were also used for, and were of substantial assistance in, attracting new members. See Army & Navy Club v. United States, 72 Ct. Cl. 684, 693, 53 E. 2d 277, 282 (1931); Chicago Engineers’ Club v. United States, 80 Ct. Cl. 615, 621, 9 F. Supp. 680, 683 (1935); Transportation Club of San Francisco v. United States, 84 Ct. Cl. 253, 17 F. Supp. 201 (1936). From these considerations, I am persuaded that the Club Del Mar was a “social, athletic, or sporting club or organization” within the meaning of section 4241 (a).
Urging a contrary result, plaintiff places considerable reliance on Howe v. United States, 226 F. Supp. 566 (S.D. Cal., 1964) and Arner v. Bogan, 27 AFTR 1092 (S.D. Cal., 1940). Howe involved the taxability of sums paid to the Balboa ■ Bay Club for rental of a boat slip. The court found the following: The club was a profit-making venture, having facilities which included rooms and apartments, dining rooms, a cocktail- lounge, and tennis courts; club membership carried no interest in the plant; there were no general meetings; members were not consulted on policy; and there was only one committee of members which planned a monthly party. Admission of new members was controlled by the club manager so that any person dropping out lost his investment; there was no provision for transfer of membership. Outside groups sometimes used the club facilities, . which arrangements were made without consulting the members. Rooms and apartments were sometimes rented to nonmembers who were then permitted to use the club facilities. A beauty shop and a dress shop on the premises were open to the public. The club rented boat docks to individual members on a monthly basis, the amount in each case being *1173 based on the size of tbe slip rented. The court held on the basis of these facts that the Balboa Club was an organization in outward form only; that it had assumed the indicia of a club without giving members customary privileges and responsibility; and that actually it was not a club or organization at all but rather a resort hotel operated for a profit. From these facts, the case appears to be distinguishable from the present one in several major respects. For one thing, unlike the present case, it did not appear that the members were associated together for the common purpose of enjoying whatever social, athletic and sporting facilities were offered by the club, or that there was substantial commingling among members in the use and enjoyment of such facilities. Nor did it appear that a material and important part of the club’s activities was devoted to the usual and customary events characteristic of a social, athletic or sporting club, such as dances, parties, outdoor athletic competitions, and the like.
Arner v. Rogan involved the issue as to whether an establishment called the Biltmore Health Club was within the purview of the dues tax section. The club’s facilities consisted of steam baths, showers, massages, ultraviolet treatments, several small rowing machines, stationary bicycles, and a small swimming pool. There was never any competition in the pool or instruction in swimming and, in the ordinary routine, the pool was simply one step in the control of body temperature and light muscular exercise. There were no sports practices which constituted a material part of the club’s activities; the members never met together or in committee, and never participated in any activities which are normally carried on by members of clubs or similar organizations. From this it was concluded that the facility did not constitute a club or organization within the meaning of the dues tax provision. The facts in the present case are obviously quite different since here the members not only participated in the Club Del Mar’s numerous social events and athletic competitions, such activities comprised major features of the organization.
*1174 The third issue presented by the parties is whether, even assuming the Club Del Mar was not within the purview of the dues tax provision, refund is barred by section 6415 of the Code. That section (as previously noted) permits a collector of a tax to seek recovery upon proof that he has repaid the amount of such tax to the person from whom he collected it, or has obtained the consent of such person to the allowance of the refund. Plaintiff does not allege, and the evidence does not show, that he, either individually or in his capacity of doing business as Club Del Mar, has made a refund to the club members or has obtained the consent of the members to the allowance of the refund sought in this suit. In such circumstances, recovery may be had only if plaintiff can show that he himself had borne the economic burden of the taxes by paying them out of his own pocket and had not collected them from members.[10] See e.g., Gumpert v. United States, 155 Ct. Cl. 721, 296 F. 2d 927 (1961); McGowan v. United States, 296 F. 2d 252 (5th Cir., 1961); United States v. Walker, 234 F. 2d 910 (5th Cir., 1956). Whether or not plaintiff bore the economic burden is a factual question. Worthington Pump & Machinery Corp. v. United States, 129 Ct. Cl. 87, 93, 122 F. Supp. 843, 847 (1954).
As to this the evidence shows: In advertising for new members, plaintiff variously expressed the amount of monthly dues a member would be liable for as $10.00 per month plus tax or $12.00 per month including tax. The application blanks for membership used during the period in issue stated that monthly dues were $12.00 “including federal tax” or “which includes federal taxes.” During most of the relevant period, the annual locker rental charged members was $24.00, the “Locker Room Pules” specifying in this connection that the “Members’ annual locker fees * * * are $20.00 annually *1175 plus tax.” [11] In view of these circumstances, it would not seem of moment that the bills sent members for dues or locker fees never contained a separate charge for taxes or otherwise referred to taxes, but rather referred to the full amount billed as dues or locker fees. There is the further consideration that on the books of the Club Del Mar the monthly dues and annual locker fees were accounted for as follows: of the $12.00 dues, $10.00 w'as allocated to club dues income and $2.00 to excise tax liability; of the $24.00 locker fee, $20.00 was allocated to locker rental income and $4.00 to excise tax liability. Also, when plaintiff in December 1960 filed a dues tax return covering the period from January 1, 1959 through October 31, 1960, he stated in an accompanying letter to the Internal Revenue Service that the “tax has been collected by me from the members of the Club Del Mar.” See Bunker Hill Country Club v. United States, supra, p. 385; Smith v. United States, 242 F. 2d 486, 487 (5th Cir., 1957). Plaintiff argues, however, that he suffered considerable losses during the period in question and that this shows he must have paid the taxes out of his own pocket. But given the circumstances present here, this hardly seems determinative. See Worthington Pump & Machinery Corp. v. United States, supra, p. 93. For the other considerations mentioned above compel the conclusion that plaintiff has failed to show that he bore the economic burden of the taxes; indeed such considerations demonstrate that he, in fact, collected the taxes from the members. So in passing it might be observed that had plaintiff not collected the taxes from the members, but instead paid them from his own pocket, his losses would have been that much greater.
In conclusion, since the record shows that the Club Del Mar was a “social, athletic, or sporting club or organization” within the meaning of the dues tax provision and since, in any event, plaintiff has failed to prove that he bore the economic burden of the taxes in question, I am of the opinion that the petition should be dismissed.
*1176 FindiNGS op Fact
Tax Payments Involved
1.This is a suit for refund of club dues tax, including interest and lien fees thereon, in a total sum of $86,450.83, assessed by defendant against plaintiff under section 4241 of the Internal Eevenue Code of 1954, and collected by defendant from plaintiff on or about the dates noted, as follows:

Date Paid Amount

My 3, 1959_$9,296.38
Dec. 12, 1960_ 2,500.00
Sept. 11, 1961_-— 6,060.04
Sept. 14, 1961_ 10,497.05
Oct. 5, 1961_ 5, 000. 00
Nov. 3, 1961_ 5,000.00
Dec. 4, 1961_ 5,000.00
Jan. 8, 1962_ 5,000.00
Feb. 6, 1962_ 5,000.00
Mar. 7, 1962_ 5,000.00
Apr. 10, 1962_ 5,000.00
May 21, 1962_ 23, 097. 36
2. In respect to an additional sum claimed in the petition, a sum of $851.92 paid February 9, 1959, plaintiff now concedes that refund thereof is time-barred by section 6511 of the Internal Revenue Code of 1954. In respect to three further items claimed in the petition, being payments of $1,087.23, $1,020.91, and $1,431.82 made on February 26, March 21 and June 29, 1959, respectively, and covering the first quarter of 1959, plaintiff now concedes that refund thereof is also time-barred by section 6511. In respect to still another sum claimed in the petition, a sum of $4,523.15 paid June 22, 1961, plaintiff now concedes that refund thereof may not be had under the claim for refund filed, for the reason that it represented cabaret taxes under section 4231 (6), and not club dues tax under section 4241.
3. The payment indicated in finding 1 above as made on July 3, 1959 in the sum of $9,296.38 covered an amount shown by a return filed for the second quarter of 1959. This amount was assessed on the basis of that return.
*1177 4. The remaining sums shown in finding 1 above, that is, the sums shown as paid after 1959, were assessed April 14, 1961, on the 'basis of audit by the Internal Eevenue Service, as follows:

Tam Interest

1st Quarter 1959 (additional)- $506.82 $49.15
2d quarter 1959 (additional)- 8,609.12 704.29
Sd quarter 1959- 12,222.34 1,040.01
4th quarter 1959- 7,147.87 523.78
1st quarter 1960- 7,040.93 420.82
2d quarter 1960_ 18,318.85 817.07
3d quarter 1960_ 12,593.78 372.81
October 1960_ 3,636.35 53.10
$70,076.06 $3,981.03;
plus additional interest and lien fees thereon, assessed May 21, 1962, in the sum of $3,097.36. These sums were paid under the compulsion of a lien.
Claim Made and Issues
5. On July 16, 1962, plaintiff filed, in the office of the District Director of Internal Eevenue at Los Angeles, California, a claim for refund of said taxes and additional amounts. The claim sought refund of all of the sums referred to in findings 1 and 2, and stated as the ground of the claim the following:
Taxpayer is not a club. The business involved was owned and operated by him as individual, although operated under the name “Club Del Mar”. _ The business consisted of a health and beach service. There was no organization of any kind, and none of the persons paying dues had any right of any kind other than the right to use the facilities furnished. The dues represented a service charge for such use.
.6. No action has been taken by the Internal Eevenue Service, or by defendant, on said claim.
,7. The above taxes and additional amounts were paid by plaintiff in respect of a business owned by him and operated by him as “A. S. Epstein, d/b/a Club Del Mar”, in and on a property then owned by 'him located at 1910 Ocean Front, Santa Monica, California. The name “Club Del Mar” was *1178 registered by him as a fictitious firm name under which, he operated that business.
8. The parties agreed that the issues in the case are as follows:
1. Whether the sums determined as club dues and locker fees, on the basis of which the taxes involved here were assessed, were sums paid to a club or organization, as those terms are used in section 4241 of the Internal Revenue Code of 1954.
2. Whether, if the payee of said sums was such a club or organization, said payee was a social, athletic, or sporting club or organization.
3. Whether refund to the plaintiff of the sums sued for is barred by section 6415 of the Internal Revenue Code of 1954.
4. Whether, if refund would otherwise be barred by section 6415, the section, to that extent, under the facts here involved, violates the due process requirements of the Constitution.
9. Defendant does not, by the use of the term “paid by plaintiff”, concede that the taxes and additional amounts paid by plaintiff were not collected as tax from the members. Plaintiff does not, by the use of the term “club”, “club dues”, or “members” herein, concede that the said business was a “club” within the meaning of section 4241.
Sums Upon Which Taxes Involved Were Assessed
10. The amounts shown as assessed in finding 4 above were assessed against plaintiff as “A. S. Epstein, d/b/a Club Del Mar”.
11. Plaintiff’s records of operations of said business were maintained on the accrual basis. The earnings of plaintiff from said business were recorded in an earnings journal, bearing at the top of each page the title “A. S. Epstein”, and bearing on the outside cover the title “Club Del Mar”. Out of each $12.00 paid as dues by a member, $10.00 was allocated on the earnings journal to an account entitled “Club Dues Income” and $2.00 to an account entitled “Club Dues Tax”. During such period as a locker fee was charged on an annual basis at $24.00 per year, $20.00 of each $24.00 paid was allocated to locker fees income on the earnings journal *1179 and $4.00 allocated to excise tax liability. Plaintiff was aware that the excise tax liability account was accrued separately in the earnings journal.
12. The income and expenses recorded in the aforesaid earnings journal were reported for income tax purposes by plaintiff on his individual tax returns under a schedule entitled “A. S. Epstein, doing business as Club Del Mar”. Income on that schedule was entitled “Income (Net) ” by which term plaintiff meant income after allowances, refunds, write-offs and excise taxes.
13. The facility in which the above-mentioned business was conducted, being the property located as above stated at 1910 Ocean Front, Santa Monica, California, bore physically in front the title “Del Mar Hotel and Club”. The same accounting records contain all of the income and all of the expenses in all of the services and departments of that facility and contain no other accounting.
14. (a) In his Federal income tax returns for the years 1959 and 1960, plaintiff reported the following with respect to the facility:
Net Income from Operating Depart-
ments: 1959 I960
Rooms_ $99,123.96 $85,601. 72
Food_' (90,900.80) (28,708.01)
Beverages_ 56,667. 57 52, 016.98
Club_ 65, 586. 75 205,163. 77
Telephone_ (18, 855.17) (19,146.31)
Other_ (4,365.46) (998.31)
Total Operating Income_ $107,256.85 $293, 959.84
Other Expenses — (i.e., General Admin., Advertising and Business Promotion, Property Taxes, Interest and Depreciation, etc.)_ 509,997.24 592,309.09
Net loss_ .($402, 740.39) ($298,349.25)
(b) Plaintiff’s Federal income tax returns reflected that he spent $46,769.90 in 1959 and $41,560.05 in 1960 for advertising and promotion of the business represented by the facility.
*1180 (c) Overhead expenses with respect to the business of the facility were allocable approximately as follows: one-third to rooms, one-third to food and beverages, and one-third to club.
(d) Plaintiff, in fact, incurred the aforesaid losses shown by his returns in the operation of the facility.
Acquisition of Property by Plaintiff
15. The Club Del Mar was built in 1926, and was well-known throughout the Los Angeles area from that time thi'ough the years in issue as a beach club having a beautiful private beach. Plaintiff purchased the facility on December 1,1958 for $1,600,000. The property was not in good condition when plaintiff acquired it and he expended at least $250,000 in 1959 and 1960 in reconditioning it. Plaintiff also had to buy an inventory and a liquor license.
16. In April 1961, because of the accumulation of losses in operating the property and the fact that as a result he was running out of money, plaintiff sold the property and leased it back, continuing to operate it as a lessee.
17. Plaintiff had about 20 years’ experience in operating hotels. He had also been, during that same period and before, in the real estate development business generally, both for his own account and as a broker.
Description of the Property; Control Over Access Thereto
18. The land comprising plaintiff’s property extended about 200 feet north-south by 300 feet east-west. A main building occupied the eastern half of the property and plaintiff’s private beach covered the western half of the property. Between the main building and this beach, at the ground, was a public way known as a “promenade” beneath which was a private underpass connecting the main building to the beach.
19. The main building was a six-story structure constructed on a slope extending downward from east to west. The main or lobby floor was the third floor of the building and actually was nearly a floor above the street, with a bank of stairs leading from the lobby doors, which were at the street level at 1910 Ocean Front, up to the lobby floor.
*1181 20. As one entered upon the lobby floor, there was a hotel registration desk on the left, with a hotel office behind it; and elevators with a men’s room behind them on the right. As one crossed the lobby, going westward and angling right, in front of the elevators and past them, one came to a reception desk. Beyond the reception desk, westward again, there was a gift shop and gift counter, with a ladies’ room and chib office on their north, 'and, westward again, a large club lounge, about 80 feet wide, extending 100 feet along the north side of the floor all the way to its west end. If one crossed the lobby, westward, and then, after passing the hotel registration desk, went left instead of right, one entered a hallway going south. On the west side of that hallway were house and public telephones, and if one continued on in that hallway there was a staircase at the end leading down below. Between the beginning of that hallway and the reception desk there was a partial wall representing the western wall of the lobby; 'behind that wall, a small banquet room, the “Walnut Boom”, about 20 by 40 feet; westward beyond that, a large area known as the “Malibu Ballroom”, serving as restaurant as weE as ballroom; south of the ballroom, another banquet room, the “Pacific Terrace”, about 4,000 square feet; and west of the ballroom and overlooking the ocean, another restaurant and a bar, known as the “Malibu Deck”.
21. On the fourth floor there was another banquet room, the “Gold Boom”, which could accommodate 100 people. On the remainder of the fourth floor, and on the fifth and sixth floors, there were hotel rooms, 120 in number. In the haEway of each of those three floors, there was a sign addressed to hotel guests advising them that the pool, men’s and ladies’ gyms, steam rooms, billiard room, private beach, etc. were avaBable to them without charge.
22. The second floor (being the floor below the lobby) had a laundry and ladies’ locker rooms. The floor below that (the ground floor from the beach side) had an indoor swimming pool about 40 by 100 feet; men’s locker rooms; a gymnasium for men, and another for women, each about 20 by 40 feet, containing the various kinds of apparatus used for physical exercise and conditioning; storage areas; and a *1182 beauty shop and a barber shop. The swimming pool had a balcony, which was part of the second floor.
23. As set forth in finding 18, between the main building and the beach there was, at the ground, a public way known as the “promenade.” To avoid crossing that public way, it was necessary to go from plaintiff’s building to his beach by way of an underpass. To go from the lobby to the underpass, one could take (1) the stairway from the hallway on the lobby’s left, or (2) the elevators, or (3) a stairway to the west of the reception desk. By any of these routes also one could enter any of the facilities on the ground and second floors. Only by the third route would one pass the reception desk.
24. Plaintiff sought to exercise control by stopping persons coming into the lobby and inquiring as to the nature of their business. Generally, if the entrant were a member of the general public merely wanting to go into the club lounge or other places in the facility, he would be discouraged from doing so. Plaintiff’s control system was not fully effective, however, so that on many occasions a member of the general public walked into the facilities from the lobby without being stopped.
25. If a member of the general public came into the lobby merely to go into the dining room to eat, he was discouraged from entering on the ground that he was on the premises of a club. If on the other hand, it appeared he might be interested in becoming a member of the club, a membership salesman would be called by the receptionist. The salesman would see that he got a good table, would get his name and telephone number, and then try to sell him a membership. If the person wanted to go down to the beach, the same procedure would be followed; a salesman would take him down, show him around, and try to sell him a membership. In case the person wanted to change clothes, the salesman would arrange for his rental of a locker for the day. He did not need a guest card for this purpose (see finding 48, infra), although plaintiff encouraged any person making a trial use of the facilities to obtain a guest card. This procedure would not be followed, however, if the person was ill-dressed; in *1183 that case he would not be admitted. Nor would it be followed if the person was trying to make a practice of it on a day-by-day basis.
26. As set forth in finding 18, plaintiff’s private beach occupied the western half of the property. In addition, plaintiff extended his beach westward some 150 feet by leasing a strip of beach about 200 feet north-south by 150 feet east-west from the City of Santa Monica. The high-tide mark was about 50 feet west of the leased strip. The beach from the leased strip westward belonged to the State of California. Plaintiff’s beach, including the leased portion, was bounded during the period in issue by: (i) a 5-foot county fence on its entire northern boundary (except for a portion open to a bridge over a ditch between plaintiff’s property and a public beach on the north); (ii) plaintiff’s 5-foot fence along the eastern boundary of the beach (which was the western boundary of the “promenade”); (iii) a cafeteria, plus paddle tennis court fences, along the entire southern boundary. The entire western boundary of plaintiff’s beach was unfenced and was open to the ocean.
27. Along the open line of plaintiff’s beach were half a .dozen signs reading “Club Del Mar”. Plaintiff had a lifeguard at his beach but did not have other types of guards at the beach to keep persons out of the property. However, plaintiff sought to prevent members of the general public from using his beach and in the event such persons were recognized, they were asked to leave on the ground that they were on private property. As a practical matter, most of the persons who actually used plaintiff’s beach were members of the Club Del Mar and hotel guests.
28. On the south side of the beach, in addition to the cafeteria, was a restaurant called the “Hut”, the area of the two totaling about 2,500 to 3,000 square feet. There were also volleyball and paddle tennis courts, and a children’s playground with a nurse in attendance.
29. Persons on plaintiff’s beach could purchase food from the cafeteria. Ordinarily the purchase would be made with scrip, which would be bought in the locker rooms before the person went out on the beach. Cash was discouraged because *1184 of lack of control. Umbrellas and back rests were furnished free to persons entitled to be on the beach.
30. The cafeteria had two windows on the south from which persons in the adjoining public beach area were served. Plaintiff placed in that area tables and chairs for that purpose.
31. Both the beauty shop and the barber shop, which were operated by concessionaires, had outside as well as inside entrances, and served the outside trade as well as persons coming in through the building lobby. If persons who came in from the outside tried to leave through the inside entrance and thus enter the other areas of plaintiff’s property, those concessionaires were instructed to restrict them, to ask their purpose, and if they wished to see the facilities, to call a membership salesman and have him come down and take them through.
32. Except for the outside entrances to the beauty and barber shops, and the access from the beach, there was no entrance to the property except the lobby entrance on the front side of the property at 1910 Ocean Front. This was the entrance to all the facilities, including the hotel rooms, the banquet rooms, restaurants, bar, gymnasium and other health facilities, and the beach.
Bates and Services
33. During the period in issue (January 1, 1959 through October 31, 1960) the entrance fee was $100.00 (except for May and June 1959, when it was $150.00) and the dues were $12.00 per month. For a time during the period in issue there was also a “transferable” membership, which if a person resigned he could transfer, subject to approval by plaintiff of the transferee, and thus recoup all or a part of his entrance fee. The dues for such memberships were the same but the entrance fee was $250.00. There was also a non-resident membership with an entrance fee of $50.00 and monthly dues of $6.00. Dues-paying members paid the same dues regardless of the number of times they used the facilities.
34. The fee for a locker, by the year, was, during the period in issue, $20.00 up to the end of June 1959 and later $24.00. The fee by the day was $3.00 on Saturday, Sunday *1185 and holidays, and $1.80 on weekdays. One who had a hotel room needed no locker because he could change clothes in his room; and he could by using the elevator go directly from his room to the ground-floor facilities and the beach. Anyone else had to have a locker for that purpose, except if he did not need to make a change of clothes.
35. The rates for hotel rooms varied from $9.00 to $15.00 in the summertime, and $8.00 to $12.00 in the winter. In addition, plaintiff sought and obtained permanent contracts with airlines (including American Airlines, SAS, and BO AC) for housing their crews, under which contracts the room rate was $7.00. Plaintiff also sold some of these people memberships. Club members received a 10% discount on hotel rooms. There was also what was known as a hotel room “cabana”, allowing use of a hotel room during the day only, from 10:00 A.M. to 4:00 P.M. The rate for that was $4.00 for two people, and $2.00 for each additional person. One could stay until 5:00 P.M. for that rate if he so requested, but if he stayed longer he had to pay the full day’s rate.
36. One did not have to be a member of the club or a guest of a member in order to be a hotel guest. One became a hotel guest by walking into the lobby and registering for a room or hotel room cabana. Any hotel guest, or guest of a hotel guest, had, for the period he was such, the use of all the facilities in the building and on the beach, the same as a member. However, a guest of a hotel guest was charged $2.00 for the use of the hotel guest’s room if he used that room to change his clothes.
' 37. Anyone, whether a member of the club or not, could call up and arrange for use of a hotel room, a banquet room, the ballroom, the “Deck”, or a beach area, to put on such functions as cocktail parties, banquets, luaus, luncheons, wedding receptions, fashion shows, benefits, business affairs, etc. Persons attending could number two or three hundred. The ones putting on such a function could invite whomsoever they pleased; those invited did not have to be members or guests of members. Once on the premises, they could go anywhere they pleased in the facility. If they wanted to use the pool, or for any other purpose needed to make a *1186 change of clothes, they could rent a locker for the day at the facility’s regular rates. Otherwise there was no charge.
38. At least one-third of the food and beverage business in the facility came from banquets and affairs given by outside organizations. The other two-thirds of that business represented chiefly service to members, members’ guests, hotel guests, and guests of hotel guests.
39. During an entire year the number of hotel guests who were neither members nor guests of members was about 25,000; and the number of people who attended banquets or otherwise used the eating facilities, and who were neither members nor hotel guests nor guests of either of them, numbered about 10,000, which figure included customers of concessionaires. See finding 37.
Operating Personnel; Concessionaires
40. Throughout the period in issue plaintiff had as an executive director a person who had had experience in the operation of the property for the prior owners. Under that director he had (1) a head desk clerk or manager of the rooms portion of the business; (2) a maitre d’ in control of the food and beverage portion of the business; and (3) a manager of the athletic facilities and the beach, pool and locker-room area. Under these three there were operating personnel numbering in total 75 to 100 people. Plaintiff also had for the major part of the period in issue, as a person to advise and assist him and the executive director, the individual who had originally built the building back in 1926.
41. Plaintiff provided various services in the facility through concessionaires. These included dancing lessons, bridge lessons, swimming lessons and massages. There were also the beauty shop and barber shop. A principal purpose for having these concessionaires was to attract more people to the premises in order to sell them memberships.
42. As a general rule plaintiff received 10 per cent of the gross receipts of the concessionaires; As to that 10 percent plaintiff was not so much interested in the money as in providing services for the members and guests and in the control the arrangement gave him over the concessionaires.
*1187 43. The persons who came for the services of these concessionaires did not have to be members, or guests of members and the beauty parlor and barber shop had a substantial number of non-member customers. However, most of the business of the other concessionaires came from members or from persons who would very soon become members.
44. With respect to such other concessionaires, if a person who just came off the street entered the lobby and indicated he wanted the services of one of them, he would be directed to that concessionaire. The concessionaire would furnish his services and then inform a membership salesman who would then try to sell the customer a membership. Plaintiff discouraged any practice of providing concessionaire services to such a' customer without at the same time trying to have him sold a membership in the club.
45. Any customer of a concessionaire, other than the barber or beauty shop (see finding 31), could have the run of the entire property, including the restaurant, bar, health facilities, and beach. If he wanted to change clothes, he had to rent a locker for the day, but otherwise there was no charge.
Advertising and Promotion
46. During the period in issue plaintiff did a good deal of newspaper advertising for members. Such advertisements represented the Club Del Mar as an all-year family beach club with recreational and social activities for the whole family. Some of the advertisements also stated in part that the monthly membership dues (in addition to the entrance fee) were $10.00 plus tax; other advertisements stated that monthly dues were $12.00 including tax.
47. The following statements contained in plaintiff’s newspaper advertisements during the years in issue illustrate the nature of the aforesaid advertising:
(a) On Sunday, June 28, 1959, the advertisement consisted of the following “Open Letter from the President”:
Dear Friends:
The purpose of this open letter is to advise you of my return as President of the Club Del Mar.
*1188 The former membership files and records were destroyed in the fire shortly after the close of World War II. (sic) Making it impossible for me to individually locate the many friends, Members, (sic) and their families, many of whom now have families of their own, that have at sometime (sic) been a part of the Club Del Mar. Because of the many years I have been away from the Club, plus the greatly increased living areas of our vastly expanded Southern California, I felt this to be the best possible medium of reaching each of you.
With the tremendous increase in population and the' forever limited beach front areas in the form of private clubs, the Club Del Mar stands alone, as far as we know, in offering the most modern facilities, social activities and entertainment in the entire (sic) of Southern California.
We have just completed a modernization program of' the entire facilities of the Club, both inside and out, including the beach area. Plus have added many new features, such as, both a men’s and women’s gym, steam rooms, massage rooms, a beauty shop and a barber shop.
You will appreciate the feeling of pride with which I look forward to an even greater Club Del Mar. Please, each of you consider this a cordial invitation to again visit the Club and renew old acquaintance and friendship — new friends are cordially welcome.
Sincerely,
/S/ T. B. Harter /S/ A. S. Epstein
T. B. Harter A. S. EpsteiN

President Owner.

(b) One of the advertising items mailed out by the dub Del Mar to its members and others around January 1960 was a message from “President Harter” stating the dues were $10.00, plus tax. It further stated: “We admit only those friends selected by our present membership;” and “Yours for a closed membership.” It also stated: “Remember * * * now your wonderful Club and all of its facilities are Exclusively Yours!”
(c) On Sunday, April 3,1960, the club ran an ad of ahnost a full-page. It was headed: “Club Del Mar, Santa Monica’s ‘Family-Engineered’ beach club * * * Fabulous Fun for All the Family.” The ad carried pictures of the club and beach, the ballroom, pool and a gym and contained a two- *1189 column comment on the facilities and activities available at the club. At the bottom it stated:
Limited Number of Family Memberships Available at $250. Eight now, the whole family may participate in the club activities for only $250 (terms if you like). This fee is paid only once. Thereafter, you need only pay the modest monthly dues of $10.00 (plus tax). And there can never be an assessment.
(d) On Sunday, May 1,1960, an advertisement announced a special pre-season 30-day offer of only $100. It noted that the Club Del Mar was a “Beach Club” and a “family club”; that “membership in the Club Del Mar is valuable — the number available are definitely limited”; and that “one entrance fee and one monthly dues includes ENTIRE family”. The ad had numerous pictures of the facilities and was ostensibly put out by the “Membership Committee”.
(e) On Wednesday, May 18, 1960, the ad bore the heading “Club Del Mar” and stated:
Applications are now being accepted for this year’s quota of new Members. Men’s and Women’s Gyms, Steam Eooms, Indoor-outdoor Heated Olympic Pool, Beach Yolley Ball and Tennis Courts, Tot’s Playground, Hotel Eooms.
Special Pre-Season (Non-Transferable) Membership, Entrance Fee only $100, Dues $10 monthly — INCLUDES ENTIRE EAMILY. HOTEL ROOMS $9.00 UP. PRIVATE BEACH. Please do not come to the Club without a telephone appointment first.
(f) On Sunday, June 12, 1960, a one-column ad stated at the bottom that “applications are now being accepted for this year’s quota of new members on pre-season basis of $100 (nontransferable) membership for entire family.”
(g) On Sunday, June 26,1960, the Club Del Mar, “Santa Monica’s ‘All Year’ Family Beach Club”, ran another nearly full-page ad with pictures of the Club and beach, the ballroom, pool and gym. It carried this copy:
FAMILY CLUB FEATURES BEAUTIFUL PRIVATE BEACH, LUXURIOUS CLUB ROOMS, “OUTDOOR-INDOOR” HEATED OLYMPIC POOL, MEN’S AND LADIES’ HEALTH CLUBS, AND FACILITIES FOR TEEN-AGERS AND TOTS
*1190 The incomparable Club Del Mar cannot be measured with, any club facility in your experience. For here is excellence that affords the ultimate in gracious living— and much more.
The private beach has been described as “the most beautiful PRIVATE BEACH IN THE WORM).” And Well it should be. Here sun lovers may frolic hi the surf, play volleyball and paddle tennis, or just relax and soak up a golden tan. If you appreciate the sun best in shady comfort, you’ll like the idea of the colorful cabanas and beach umbrellas. There are special play areas for the youngsters under the watchful eyes of trained lifeguards. Courteous beach boys will fetch back rests, umbrellas, towels * * * anything * * * at your beckon at no charge.
TEEN-AGE COKE-TAIL, BEACHNIK PARTIES AND MANX OTHER ACTIVITIES.
It might be that while others are active outdoors, you’ll prefer to visit the health club to keep in trim (or START getting in trim). Fine. Maybe a refreshing dip hi the sparkling “outdoor-indoor” pool will tempt you most. That’s a wonderful idea, too. If relaxing is your game, then one of the luxurious clubrooms is the ticket for you.
In the evenhig you’ll enjoy dining and danchig in the magnificent Malibu Ballroom. The food? par excellence ! The kitchen and service staffs at Club Del Mar set standards of achievement by which you will measure the performance of every fine club.
And here is the most important fact of all: Regardless of your pleasure preference — if it’s fun and exciting for you and your family, it’ll be happening at the Club Del Mar.
And at the bottom the ad stated in part:
You need only pay the modest monthly dues of $12, includes tax, for the entire family, and there can never be an assessment. Right now, the whole family may participate in the club activities for only $100. This fee is paid only once.
(h) On Sunday, July 10,1960, an advertisement contained a heading which read: “invitation The New $3,000,000 All Year Health and Recreation club del mar, * * * Santa Monica’s ‘All Year’ Family Beach Club” and a picture of *1191 the beach area with the text, “volley ball; tennis; child’s play (nurse attendant); cafeteria; umbrella; back rest; surf fishing; surf board; deep sea fishing, sailing, water ski 200 yards”, and with pictures also of the gym, the pool and the ballroom. The top of the advertisement stated: “Special Family Membership Offer (non-transferable) $10 per month (plus tax). For the entire family (only 10$ per day for a family of four) if your family is larger still only $10 per month (plus tax). Entrance Fee: pat only once poe ENtiee eamily now only loo.” At the bottom the ad stated: “this oeeeb expiees august i, i960. Join now. Only $10 per mo. (plus tax) for the entire family. Entrance fee of only $100.”
,48. As a part of his advertising and promotion of the club facilities, plaintiff mailed out, in each of the years 1959 and 1960, 40,000 to 50,000 descriptive folders with a courtesy guest card attached to each. As mailing lists for this purpose, plaintiff used the Los Angeles telephone directories. The folder contained the address of the club, a map showing how to get there, and photograph of the club premises. It stated in part: “* * * Gyms, Seducing Equipment, Handball, Tennis, Olympic Heated Pool. Social, Plealth and Recreation Activity for all Ages.” The folder also announced to the recipient: “The new Santa Monica Club Del Mar extends to you and your family or guest a cordial invitation to visit and inspect the club and health facilities.” The courtesy guest card attached stated on its face that it entitled “the bearer and party” to the use of the facilities for one visit on a cash basis. For the period of his visit the bearer had the same privileges as a member. If he needed to make a change of clothes, he could rent a locker for the day. The holder of a guest card who did not become a member was discouraged from using the facilities more than once or twice.
49. (a) Plaintiff had some ten to twenty membership salesmen during the period in issue who worked on a commission basis. One of their sales methods was to spend all day long on the telephone soliciting club memberships from those persons to whom courtesy guest cards had been sent. Another method was to follow up on referrals. They also tried *1192 to sell memberships to customers of concessionaires, or other interested members of the public.
(b) In selling a membership the salesman analyzed the family’s needs; pointed out what facilities would be available to them, such as the beach, gymnasium, etc. and how they could be utilized by each member of the family; and stated that the Club Del Mar had dinner dancing, fashion shows, etc.
50. (a) In addition, plaintiff mailed out club literature to members and to thousands of other people as well. The other people would include persons with whom the facility had done business, where they had shown an interest in the club and had not joined, or where they looked like good prospects to the salesman, etc. Plaintiff also obtained lists of new arrivals in the area from a community welcoming committee and for which he paid 200 to 300 per name. Altogether plaintiff obtained about 500 names of new arrivals in 1959 and the same number in 1960. The literature sent such new arrivals would include membership bulletins, announcements, promotion pieces in the form of membership application blanks, the club magazine “Club Del Mar Life”, etc. They would also be sent courtesy guests cards.
(b) Included in the club literature thus sent out was a printed pamphlet showing pictures of the club’s facilities and containing the “President’s Message” and the following statement, among others:
In the entire roster of fine clubs in America none surpasses the Club Del Mar for luxurious appointments, congenial atmosphere and unlimited facilities for fun and relaxation for the entire family the year ’round. Pictured on this page are just a few of the highlights of this magnificent beach club, long recognized as one of the nation’s finest social clubs. - Because it is located in the center of all good things, you’ll want to use your club often.
51. The membership application blanks referred to in finding 50(a) bore some or all of the following:
The new three million dollar all year health and recreation Club Del Mar in ‘smog-free’ Santa Monica / the most .beautiful private beach in the world / health facilities: men’s and ladies’ gyms, steam rooms, ‘outdoor- *1193 indoor’ Olympic heated pool; beach volley ball; tennis courts; — supervised free. Tots playground / recreation; dinner dancing Friday, Saturday, and Sunday, name bands; teenage coke-tail and beach-nik parties; bridge and dance lessons; excellent food at modest prices / your family will make the best friends of your life at your club / this membership is your invitation to the honor roll ball — you will not want to miss it. Meet Hal Hill your new food manager direct from 6 years at the Houston Club — world renowned for fine food — prepare to be pampered at your club.”
52. New members were also obtained through current members by offering them incentives. Each member who brought in a new member received compensation of $20.00 if he brought in a family member and $10.00 if he brought in a single member. These amounts were paid in scrip, which was accepted as money anywhere around the facility, as for food, etc. It was not necessary for a member actually to sign up the new member; any prospect referred by him would be followed up by a salesman. Plaintiff also gave an honor roll ball, and every member who brought in a member also got two free tickets to the ball. There were, in addition, prizes for those who brought in the most members, such as trips to Hawaii, television sets, etc. Plaintiff also followed up the references given by applicants in an effort to sign up such references as members.
i53. On May 1, 1959, plaintiff issued a “Membership Bulletin” which stated:
I wish to personally thank all of the members who have recommended their friends for membership in the club del mar. It is with this type of enthusiasm and cooperation that your Club will be one of the finest in the country.
NOTICE: Effective midnight, April 30, 1959 the entrance fee for membership m the club del mar will be $150. This entrance fee of $150 will be for the month of May only, after which the entrance fee will again be revised.
Dues will remain at the original rate of $12 per month.
/s/ T. D. Harter
T. D. Harter

President.

*1194 . 54. About 50 per cent of new members were obtained from advertising and about 50 per cent by referral from current members. Plaintiff engaged in such a considerable drive for new members because acquiring new members would be more remunerative than having persons use the facilities once or twice a summer as nónmembers.
55. For the purpose of promoting the hotel business, plaintiff also distributed a brochure all over the country to travel agencies. Many thousands of such brochures were distrib-utedduring the years 1959 and 1960. This brochure was entitled “The Del Mar Hotel and Kestaurant”, giving the same address as the Club Del Mar and containing a description ¡of the hotel and elub premises, including the gymnasium and the .beach, in full and elaborate detail and with numerous illustrations. It was sent out to travel agencies with an accompanying letter, soliciting their business and offering additional copies of the brochure upon request.
Membership'
56. During its early history in the 1930’s, the.Club Del Mar had about 3,000 members. Plaintiff started with about 200 dues-paying members, carried over from the prior owners, increased the number by 500 or 600 by the end of 1959, and by about 1,000 by the.end of 1960. At the time of the trial the dues-paying membership was 1,400.
57. The membership turnover per year was one-fourth to one-third.
58. In addition to dues-paying members, plaintiff gave out four or five hundred permanent memberships called courtesy or “C” memberships to people who would be good promotional assistance to the club business, such as a secretary of a firm who made hotel arrangements for visiting personnel, airline people who might refer some of their hotel and other business to plaintiff, executives in a position to throw banquet business his way, publicity peóple, etc. Such persons would pay no dues; they would pay only for food and other day-today items..
59. (a) Plaintiff hoped some day to have a closed membership which he estimated would require from 2,500 to 3,000 members. By a “closed membership” he meant a num *1195 ber large enough to provide a profitable operation and stop the continuous program and expenditure for acquisition of new members. In a letter to the members printed inside the cover of an issue of the club’s magazine, plaintiff stated: ■
* * * you have seen a considerable drive for membership in the Club. We have partially achieved our goal and I believe next year will see us at a closed membership. Help us reach this goal among your friends — they will be our best members.
(b) The Club Del Mar literature indicated that new memberships would be .limited to filling vacancies and plaintiff’s advertisements indicated that new memberships were limited to a specific yearly quota.
60. The membership application blanks required an applicant to give financial and social references. The financial references’ were checked for information which would determine the extent of credit plaintiff could reasonably place at 'the applicant’s disposal. Plaintiff allowed credit to the members and the purpose of the references was to make the best credit check possible.
61. Plaintiff also granted credit to persons who were not members. These accounts were known as “city ledger accounts”. They would be established for anyone who might be-the source of hotel, banquet or restaurant business in the facility. Plaintiff also gave out credit cards to persons who were good customers of the restaurant or bar but who did not want to become members. Those cards were good on their face for rooms, restaurant and bar, but once the holder was in the premises there was nothing to stop him from using all the facilities except that if he wanted to make a change of clothes he could rent a locker for the day. However, there is no evidence that such credit, card .holders actually used the beach, pool or gym to any significant extent. See finding 27. Plaintiff would not issue a credit card to a person who merely wanted it in order to enable him to use the beach, pool or gym.
62. Some membership application blanks contained printed on the back thereof “Excerpts from the By-Laws; House Bules and Begulations of the Club Del Mar.” Such application stated that if the applicant were accepted, he *1196 “agree [d] to abide by the By-Laws as they now exist or as they may hereafter be amended.” All other applications contained a statement that the applicant “if accepted agree[d] to abide by the By-Laws as they exist (a copy of which have been handed me and are hereby approved by me and made a part hereof) or as they may hereafter be amended.” In order to become a member a person signed an application blank and attached thereto his check for the entrance fee, or both entrance fee and first month’s dues.
63. There were three classes of memberships: regular family transferable memberships; non-transferable family memberships; and non-resident memberships. In the event a non-transferable member brought in a new member, his membership was made transferable. See finding 33.
64. On becoming a member the applicant received a letter of acceptance and also a copy of the By-Laws and rules and regulations. During at least the first part of the period in issue, there were two versions of the letter of acceptance, both of which were signed “T. D. Harter, President.” One version read:
It gives me great personal pleasure to welcome you as a member of the Club Del Mar.
In the short span of time since I have returned to the Club Del Mar we have enjoyed the privilege of enrolling many distinguished people. I feel a sense of personal pride in including you in the Club’s membership roster.
We hope you will have occasion to visit your Club often and participate in the many social and recreational activities.
The other version of the letter of acceptance read:
We are pleased to advise you that your application for membership in the Club Del Mar has been accepted. Enclosed are your membership cards.
I am sure that you and your family will enjoy participating in the Club’s many social and recreational activities.
It is our desire that you as a member of the Club Del Mar will enjoy a premium of prestige in your Club membership second to none anywhere.
*1197 Should you have any questions about the Club or if we may assist you in any way please let us know.
65. The application blank, as so accepted, was plaintiff’s sole contract with the member. The application blanks which plaintiff used for this purpose during the years in issue stated that the dues were $12.00 per month, “including federal tax”, or, “which includes federal taxes”.
66. (a) The bills sent to members for dues or locker fees never contained a separate charge for taxes, nor otherwise referred to taxes; they referred to the full amount billed as dues, or locker fees, as the case might be. The same was true of the ledger account of each member.
(b) The bills sent to members as of December 1960 contained the following statement:
The amount paid on this bill will be used in its entirety to repay loans and reimburse reserve funds used for construction, furnishings, etc., pursuant to section 4243 of the Internal Eevenue Code, until such repayment and reimbursement is complete.
67. The membership application blank provided that the membership entitled the member to the “privilege of using any and all of the facilities and services which the Club may have to offer during the continuance in force” of the membership and subject to the club’s “by-laws” and “rules and regulations”. It further provided, and an applicant was 'also orally informed, that the membership was “non-participating”, that it did not entitle members to “any right, title or interest in or to any of the Club’s assets, properties, profits, earnings, dividends, capital stock, shares or securities or those of any person or corporation which may now or hereafter own, operate, maintain or manage said Club”; also that it was “non-liable and non-assessable.”
68. Under the “by-laws” and “rules and regulations” it was provided that “All memberships shall be exempt from assessments of every kind and nature”; that “members shall not be personally liable for any debt or financial obligation of the Club”; that “Membership does not entitle members to any voting rights”; that the “Membership Committee shall be appointed by the Board of Directors or owners”; that the said “committee” shall have “full authority to act on appli *1198 cations for membership”, and “interpret policies”; that its “actions shall be considered final subject only to review by the Board of Directors or owners”; and that it “shall have the power to cancel and terminate any Membership at any time and for any reason it may deem proper.” The losses incurred in 1959 and 1960 in the operation of the club and hotel were entirely the losses of plaintiff; none of the members were liable for or bore any part of those losses, nor any of the expenses incurred in the operation of the facilities involved.
By-Laws; Rules and Regulations
j69. More particularly, the by-laws which were in effect during the period in issue provided in part as follows:
ARTICLE I: Objectives
To maintain, conduct and operate an exclusive family club in the best social traditions; also to develop a community spirit, goodwill, sociability and friendship among and to promote the physical and social welfare of its members and their families and guests.
ARTICLE II: Classes of Membership
This Club shall have the following respective classes of members whose, qualifications, rights, and interests shall be as set out in these bylaws:

(a) Regular Family Transferable Members

Section (a) A Regular Membership may be issued to any person of the age of twenty-one years or over who has been approved by the Membership Committee.

(b) Non-Transferable Family Members

Section (b) A Non-Transferable Family Membership may be issued to any person of the age of twenty-one years or over who has been approved by the Membership Committee.
This membership shall be subject to the same Srivileges and obligations as set out in Article III of the •y-Laws, except for the following:
I. Those memberships are NOT transferable:
H. This class of membership is subject to cancellation by either party after one year.
*1199 III. This membership may be converted to a regular membership on the following basis:
a. Application to be made for a regular membership:
b. Payment for the entrance fee then in existence for a regular membership at time of application.
■ IY. The sale price of this class of membership may be changed or this membership may be withdrawn from sale at anytime without notice by the Board of Directors.

(c) Non-Resident Members

Section (c) A Non-Kesident Membership may be issued to any person of the age of twenty-one or over whose residence is more than one hundred miles from the Club Del Mar and who has been approved by the Membership Committee.
AKTICLE III: Structure of Membership
Section (a) All memberships shall be exempt from assessments of every kind and nature; members shall not be personally liable for any debt or financial obligation of the Club. All memberships are non-participating. Membership in this Club constitutes a personal privilege only to the person to whom the card is issued. Cards may not be transferred or used by any person other than the person whose name appears on the card. Such use may constitute forfeiture and termination of membership. Regular family transferable membership may be transferred subject to application of the new member, his acceptance by the membership committee and his assumption of obligation, duties, by-laws and club rules and regulations. Membership does not entitle . members to any voting rights, nor to any right, title or interest in or to any of the Club’s assets, properties, profits, earnings dividends capital stock, shares or securities or those of any person, partnership or corporation which may now or hereafter own, operate, maintain or manage said Club. The Board of Directors (in their sole discretion) may. change the amount of dues or time of payment at any tune without notice.
Section (b) If at any time, in the opinion of the Board of Directors, the Club can no longer be operated without sustaining continued operating deficits, the privileges, facilities and properties of the Club, or any of them, may be closed down and/or the Club may cease to operate.
*1200 AETICLE IV: Membership Committee
Section (a) The Membership Committee shall be appointed by the Board of Directors or owners.
■ Section (b) The Membership Committee shall have the full authority to act on applications for membership, interpret policies as set forth in the Club By-Laws, and its actions shall be considered final subject only to review by the Board of Directors or owners.
Section (c) All information submitted to the Membership Committee and all proceedings of the Membership Committee shall be strictly private and confidential.
Section (d) The Membership Committee shall have the .power to cancel and terminate any Membership at any time and for any reason that it may deem proper to maintain the objectives set forth in Article I. It may suspend membership privileges for conduct unbecoming a member.
AETICLE Y: Membership Cards
Section (a) All members in good standing shall be furnished with identification cards.
Section (b) Immediate family of members as herein defined may be furnished with membership cards. Immediate family shall be limited to those residing in the same household; this includes children under twenty-one years of age and not more than two adults. Children will not be issued membership cards until they reach the age of twelve years.
Section (c) Immediate family must be listed on the Application Blank or on a supplemental Eequest for Change form which must be dated and must show all family members; when filed it will replace and void all previous information given in respect to family members listed.
Section (d) Members shall be held responsible for conduct of family members and guests.
Section (e) Members shall be held responsible for indebtedness incurred by family members and guests. Any member account for dues or services at the Club not paid within 15 days after presentation of bill shall be subject to (i) reasonable interest on service charge, (ii) attorney fees if legal action is required to collect the same.
*1201 ARTICLE VI: Application for Membership
Section (a) The entrance fee and dues as fixed and established by the Board of Directors shall be paid in full before any action will be taken on any application for membership.
Section (b) The proceedings of the Membership Committee upon any application or membership shall be held to be strictly private and confidential. See Article IV, Section (c).
Section (c) All matters set out in the Application for Membership form on the reverse side hereof, including the fees listed, shall be binding and as though specifically set forth in these By-Laws.
Permission is hereby granted to the Club Del Mar to use the names or pictures of all members, their family, or friends for publication in Magazines or Club publicity.
ARTICLE VII: Resignation of Membership
Section (a) Each holder of a Membership may.tender a resignation for such membership by giving written notice to the Club and by paying all dues and obligations then owed to the Club. Before acting on the resignation, the Management requires that all accounts be paid in full to date and that all Membership Cards and keys be returned to the Club. All of the above must be complied with by the tenth of the month or dues for that month become due and payable.
Section (b) All prepaid dues or entrance fees are forfeited on resignation, or termination or cessation of operation of membership. All prepaid locker rentals are also forfeited as set forth in Article XI.
ARTICLE VIII: Guests
Section (a) None but the members and their families as hereinbefore provided, and guests introduced by members shall be admitted to the Club premises.
Section (b) A guest must be accompanied by a member unless a guest card has previously been issued from the Membership Office at the request of the member.
Section (c) Non-resident guest cards may be issued at the request of any member for a period not to exceed fifteen consecutive days, but shall not be renewed until *1202 the expiration of ninety days. Guest cards are subject to regular guest fees.
Section (d) The Club reserves the right to refuse admission to any' guest of members whose presence would tend to violate the tradition of this being an exclusive family Club.
Section (e) The Club may limit the number of guests that any member may introduce to the Club premises on any occasion and may limit the number of times any one guest may enjoy its facilities. Guest restrictions by Management will, of course, be reasonable at all times and enforced only to prevent abuse of this privilege to the detriment of the Membership as a whole.
Section (f) No member shall be permitted to introduce as a guest to the Club any person who is suspended or has been expelled from the Club, unless that person’s record has been so cleared as to make him eligible for reinstatement. A member may not knowingly bring in to the Club as a guest an ex-employee of the Club within one year without prior authorization from Management.
Section (g) Members bringing guests to the Club for use of pool or beach shall obtain locker room facilities for them. A guest locker fee is charged for these facilities which includes towel for each guest. These guest locker fees shall be as outlined in the locker room regulations.
AETICLE IX: Credit
Section (a) The Management shall be the sole judge of the amount of credit to be extended to any member and of the proper time to collect any indebtedness to the Club.
Section (b) Accounts become delinquent 15 days after presentation of bill, and, if not paid, such delinquency may be posted on the auditor’s board. In the event an account is not paid in full within forty days from date it is first due and payable, all charge privileges may be automatically forfeited and terminated without further notice; this provision in no way waives Management’s rights as outlined in Article Y, Section (e).
Section (c) It is the members’ responsibility to notify the Membership Office in writing of any change of address in order that statements may be properly rendered. Failure to so notify the Club within a ninety day period may result in termination of membership.
*1203 ARTICLE N: Hotel Rooms
Section (a) Members desiring rooms will be accommodated according to priority of application, and a member may not transfer bis right to a room.
Section (b) _ Members making reservations for bedrooms but failing to cancel same 'by 12:00 noon of that day will be charged for one day.
Section (c) Check out time is 4:00 p.m. unless exception is made by the front desk. If the room is kept later than the agreed check out time, an additional day’s room rental will be charged.
Section (d) Members who fail to notify the desk when checking out will be charged for an additional day’s room rental.
ARTICLE XI: Locker Rentals
Section_ (a) Daily arid annual locker rentals shall be as outlined in the locker room regulations. Annual lockers may be rented only by Club members.
Section (b) All prepaid locker rentals will be forfeited upon resignation or termination of membership.
Section' (c) Each locker will be used only by the person or persons to whom it is assigned. Violation of this ruling will forfeit member’s locker room privileges.
Members shall be responsible to the Club for any damage to its. property caused by them, the amount to be collected in the same manner as that in which other debts or obligations are collected, failure to pay bill for same when presented to have same effect as any infraction of these by-laws, rules and regulations.
Any member, guest, employee, or other person who in any manner makes use of or accepts the use of any apparatus, appliance, facility, privilege or service whatsoever, of the Club to which these by-laws apply, or who engages in any contest, game, exercise, competition, or other club activity, either on or off club premises, shall do so at his own risk, 'and shall hold the club harmless from any injury, damage, or liability resulting from such use, contest, game, exercise, competition, service or other activity, and/or by reason of any act or omission of any employee of the club.
Should any party or parties bound by these by-laws bring suit against the club on any claim or matter and fail to obtain judgment therein against the club, said *1204 party or parties shall be liable to the club for all attorneys’ fees paid by the club in defending such suit, and judgment therefor shall be entered therein.
70. (a) The “House Bules and Begulations” which were a part of the By-Laws of the Club Del Mar provided, as follows:
1. Members shall enter the Club building and premises only through the main entrance aiid not by way of the beach. Special exception made for members with coronary and similar conditions upon presentation of a letter from their doctor advising the Club of the exact nature of the illness, duration, etc.
2. Membership cards are non-transferable and violation is subject to cancellation or suspension as provided in Article IV, Section d of the by-laws. Membership is transferable as heretofore provided.
3. Charge tickets are to be signed only by authorized members and membership number is to be shown on each charge slip. Membership cards are to be shown at time of charge.
4. Members and their guests using swimming pool or using beach for swimming or sun bathing are required to have locker room facilities or hotel room.
5. Articles of clothing may not be removed while on beach for the purpose of swimming or sun bathing.
6. No person is allowed to come as a guest of a member more than twice in any one month on Saturdays, Sundays, or holidays. This does not apply to single members’ escorts or dates or non-resident guests of members.
7. The Club reserves the right to restrict the number of guests per member from time to time and to set guest fees. Members are urged to be especially reasonable during the beach season in exercising guest privileges. This is for the comfort and convenience of all Club Members.
8. Members will be held responsible for the conduct of their guests. If a member authorizes a guest to charge to his membership account, he will be responsible for the debt incurred. Such arrangements must be made through the Membership Office.
9. The Club will not be responsible for articles lost or damaged in the Club or on the Club premises.
10. Bathing attire is prohibited on the main floor, including entrance of the Club at all times.
11. The lounge, dining room and bar areas within the Club building are subject to more stringent regulations *1205 than the rest of the Club premises. The wearing of shorts and T-shirts is prohibited at all times. Bermuda shorts, pedal pushers, slacks, and other similar attire until 6:00 in the evening daily and before 12:00 noon on Sunday. During the beach season (June 1 through September 15), sports attire is permitted for men in the evening except that on Friday and Saturday evenings after 6:00 p.m. coats and ties are required. Coat (with sport shirts or ties) are requested Sunday evenings. Ties and coats are required any night when there is dancing unless otherwise specified.
12. Members and their guests are required to wear identification tags when provided for beach and pool.
13. No food or beverages shall be brought into any part of the Club premises by any member or guest. Also, no picnicking is permitted on the beach.
14. Boisterous or improper behaviour will not be tolerated in the Club or on the Club premises; persons guilty of such conduct may be either suspended from the Club or have their membership terminated.
15. Children are prohibited from playing or romping within the main floor of the Club building. They are also excluded from the cocktail lounges at all times. (Parents will be held responsible for the children who violate this rule.)
16. No pets shall be allowed anywhere on the Club premises.
17. All suggestions or complaints against the management of the Club or against the conduct of any member must be made in writing to the Club Management and signed by the complainant. No verbal complaint will be officially considered.
18. The Club reserves the right to impose a minimum charge or cover charge on special occasions such as New Year’s Eve, and on the ballroom floor when the dinner dance is being served.
'(b) The “Locker Room Rules” stated as follows:
1. As stated in the House Rules, members and their guests using swimming pool or beach for swimming or sun bathing are required to have locker room facilities.
2. All members and guests are required to register upon entering locker rooms.
3. Daily locker rental fee applies to all persons 6 years old and over.
4. Guests charges with or without locker are $1.50 plus tax daily; weekends 'and all holidays $2.50 plus tax. Children from 6-10 years of age half price.
*1206 5. Daily membership locker charges are $1.00 plus tax on week days, weekends and all holidays.
■ 6. Members’ annual locker fees for the men’s or ladies’ locker room are $20.00 annual plus tax.
7. Members and their guests are required to wear identification tags, whether in street clothes or beach attire, when provided for as stated in the house rules.
8. Club Del Mar Towels are for Locker Eoom use only. Members and guests supply own towels for beach and pool.
9. All articles of value not previously checked at main office of check room must be checked at locker. As stated in the House Rules, the Club will not be responsible for articles lost or damaged in the Club or on the Club premises. Members checking articles on Club premises do so at their own risk.
10. Boisterous or improper behaviour will not be tolerated in the Club or on the Club premises. As stated in the House Rules, persons guilty of such conduct may be either suspended from the Club or have their membership terminated.
11. Non-resident member’s locker rental fee will be $10.00 per month or $5.00 weekly plus tax.
12. All parking facilities are used by members at their own risk.
Operations; Social Activities; Affiliation Arrangements
■71. The facility was referred to as a club on the stationery, on the applications for memberships, and on the bulletins mailed out to members and others announcing special events at the club. From time to time the club literature included the name of plaintiff as “owner”.
72. The Club Del Mar membership card carried the instructions “To be used by person to whom issued ONLY.”
73. Although the by-laws, application blanks and advertisements referred to T. D. Harter as president, to the membership committee, and to the Board of Directors, in actuality, Harter was an employee of plaintiff; there was no membership committee; and there was no Board of Directors. Plaintiff alone approved membership applications and it was he who, in effect, was the membership committee. None of the members had any authority in the operation of the property, nor any right of approval or other control in respect of *1207 the applications for membership. Plaintiff’s checks were signed only by him or his executive director.
74. Plaintiff alone fixed the entrance fees, dues and locker fees; no one else had any authority in respect to this. Plaintiff exercised this authority as owner of the property. From plaintiff’s standpoint, his purpose in respect to the club was to make money. It was one of his real estate ventures. Plaintiff did not deal in any respect with any group of members; his relation was directly with each member separately. There was no representative of the members to deal with him. The members had no organization of any kind or any committees; nor did they get together in any meeting, as members.
75. One of plaintiff’s major objectives in the operation of the Club Del Mar was in conformity with Article I of the ByLaws “* * * to develop a community spirit, goodwill, sociability and friendship among and to promote the physical and social welfare of its members and their families and guests.”
76. The club periodically issued a magazine entitled “Club Del Mar Life” which announced club events such as dances, luaus, family dinners, teen-age parties, fashion shows, listed new members, and contained pictures of members and other information of interest to the members. This magazine was sent not only to members but to hundreds if not thousands of prospective members as well.
77. Among parties given by the Club Del Mar were those on Halloween, Thanksgiving, Christmas and New Year’s. These functions — for each of which a separate charge was assessed — were announced in the club magazine or in a brochure sent to members, prospective members, hotel guests and business houses. The Halloween party — which was a dance in the ballroom — was announced in the dinner bulletin for that day as being for members only. Those attending parties given by the Club Del Mar would usually be club members, members’ friends and persons connected with the same business houses as members, and hotel guests If a member of the public who heard about a Club Del Mar party wanted to attend and came into the club, he would be asked *1208 how he happened to come in; if he was presentable, he would be allowed to come in and at the same time, his name and address would be taken on the assumption that he would be a prospect for membership.
78. The club had dinner dancing in its ballroom on Friday, Saturday and Sunday evenings. During the period in issue, these affairs were not open to the public or advertised as such, except for some three months in 1959 when such affairs were advertised as open to the public. In that three-month period, the preponderant majority of persons attending such dinner dances were club members.
79. Plaintiff gave free movies at the club on Saturday afternoons for club members and their children and for persons who had indicated some potentiality as members and their children on the basis that if the latter liked the show and the club, the parents might take out membership. The general public could not attend these movies.
80. Various charities and business houses rented various facilities at the club from time to time and put on various affairs and parties. These affairs were handled financially by the organization or group which put on the affair; such organization or group would buy from plaintiff dinners for the persons attending, say 200 or 300 or as many as it planned to have attend. See finding 37. Plaintiff did not know who those attending were. The club members, as members, had no authority whatsoever in connection with such affairs.
81. On occasion during a membership function at the club, a member would notice a non-membership function being held on some part of the club’s premises at the same time and would make inquiry. Plaintiff would usually respond that that was the way he was running the facility and that the member had to accept it or drop out. Also on occasion members would criticize plaintiff’s newspaper advertising on the ground that they were paying for a facility that they thought had certain privacy to it. Plaintiff would reply that he was running a business that had many facets to it, not just a club, and that was the only way he could run it.
82. Considerable attention was given to activities for children of members. Thus there were held teen-age dance *1209 parties, a children’s Easter party, and competitions of various kinds, including paddle-tennis and volleyball tournaments, and pool and ocean-swimming events.
83. The club sponsored athletic competition between its members on the Fourth of July, Labor Day, and other holidays. These competitions included paddle tennis, volleyball and shuffleboard tournaments, and swimming races both in the pool and ocean for boys and girls from 6 to 15 years of age, each of whom had to pay 50 cents to enter. These competitions were limited to members only. They were run by Frank Holborow, who was designated as athletic director. Holborow assisted the members in forming teams for the swimming events. Prizes provided by the club were given to winners of the various events.
84. In addition to running the Fourth of July, Labor Day and other holiday events, Holborow had the swimming concession at the club and taught swimming there as concessionaire. He organized a swimming team for the club which represented the club in various competitions with other teams. Most of the individuals on the club’s swimming team were members of the club, although some were not. The only persons other than members whom Holborow taught swimming to were the individuals on the swimming team.
85. Besides members of the club and hotel guests, the pool was used by the Santa Monica lifeguards between 9:00 and 10:00 A.M. when there were no members in it, and on a few occasions by a civic group for a charity function.
86. The Club Del Mar had some 36 club affiliates in different sections of this country, as well as an affiliate club in Monterrey, Mexico, and in London, England. Under the affiliation arrangement, the affiliate club had the privilege of referring guests to the Club Del Mar and the Club Del Mar had the privilege of referring guests to the affiliate. In the latter case, credit would be given the member at the affiliate club which was guaranteed by plaintiff up to $50.00. The amount charged by the member at such club would be billed to plaintiff and plaintiff in turn would bill the member.
87. Visitors’ cards were given to members of the Club Del Mar to enable them to visit other affiliate clubs, in accordance *1210 with the affiliation arrangement. Such a visitor’s card stated:
[Affiliate]
To the---
Gentlemen:
[Individual’s name]
This will introduce__ a
member of the Club Del Mar. Kindly extend him visitor’s courtesies of your club.
Yours very truly,
/s/ T. D. Harter
T. D. Harter

President.

Date
C.D.M. Membership card must be presented with this card within 30 days of above date.
88. Actually this visitor’s privilege was not limited by plaintiff to members of the Club Del Mar. It was given by him to anyone he wished to give it to. For example, it was given to friends of members, hotel guests, and to airline personnel who had been hotel guests or had been members. To the extent that plaintiff gave visitors’ cards to non-members of the Club Del Mar, he acted contrary to the affiliation agreement which limited the privilege to members of the Club Del Mar. Further, by giving a visitor’s card and a membership card to a non-member, plaintiff, in effect, represented to the affiliate club that that person was a Club Del Mar member, which representation was contrary to fact.
Accounting Practices
89. When plaintiff acquired the Club Del Mar, he employed Charles W. Welch as manager and as supervisor of accounting, in which capacities he served from December 1958 to June 1959. Welch was a certified public accountant specializing in the field of hotel and club accounting. He had audited plaintiff’s hotel interests intermittently since 1946; he had also audited the Club Del Mar prior to its acquisition by the plaintiff.
90. Welch set up plaintiff’s boohs for the Club Del Mar. He also prepared and filed excise tax returns for the Club Del Mar for the last quarter of 1958 and the first quarter of 1959. The returns were filed on the basis that of each $12.00 *1211 paid as monthly dues, $2.00 was allocated to tax and $10.00 was allocated to dues. This followed the method of accounting for dues income and tax liability on the books of the Club Del Mar. See finding 11.
91. During the latter part of the period in issue, plaintiff’s club manager and accountant was James Harrison.
92. Plaintiff’s accountants made up a daily report which generally was shown to plaintiff every day. On this report the $12.00 monthly payment made by the members was allotted in two separate accounts; one for dues income, the other for excise taxes.
Statements and Letters by Plaintiff to Internal Revenue Service Regarding Excise Tax
.93. On August 15, 1960, plaintiff, Harrison and Eobert Prince (who during the period in issue had audited the Club Del Mar’s books) met with M. G. Lewis, an agent of the Internal Eevenue Service, for the purpose, among other things, of discussing excise taxes not remitted by plaintiff. At this meeting, plaintiff “mentioned that some law was passed wherein the dues tax could be retained to make improvements and not remitted to the Internal Eevenue Service.” Plaintiff stated that “Therefore, he held back paying the above-mentioned quarters.” Also discussed at this meeting was the matter of a “cabaret tax due on business that took place ‘while open to the public’ for about a 8-month period while Euss Morgan was playing there.”
94. (a) On August 15,1960 (the same day as the foregoing meeting), plaintiff signed the following letter addressed to the District Director of Internal Eevenue, Excise Tax Division, Los Angeles:
I acquired this property December 1st, 1958 and I preseume (sic) the last quarter return was filed on behalf of the previous owner and included my one month operation. Since I had no liquor license during that month it is possible that also, is why the bookeeper (sic) who knew the previous owners better than he knew me, returned it that way.
I do not know why he did not return the first quarter and filed only the second quarter, but I do recall that after the filing of the second quarter things got into *1212 such a turmoil of turnover of personell (sic) that I do not know quite what was filed and what was not.
As I explaianed (sic) to Mr. M. G. Lewis the actual reason was probably the immenent (sic) bankruptcy (sic) of the whole business and constant changes in personell (sic) with no one to whom I could give instructions or possibly just no direction — as I am not a hotel man[1] and I let some bookeeping (sic) go as I did not want to hire the professional bookeeping (sic). However, ALL books and records are in the house from the day I took over and I have every tape, charge, receipt and disbursement, they will be available to be checked when we submit our statements.
I recall that my present manager Mr. Jim Harrison was told by me that there was a new law last year relative to the use of excise tax for payment of rehabilitation of Clubs and I know he wrote to Washington asking for forms on this regard as I wanted to file for a return of the some $9,000 we paid in July 1959. This was probably another reason we did not file a return. Mr. Harrison does remember writing to Washington and not receiving any reply to his request for forms to request this rebate. In the next 30 days Mr. Harrison will file a return for the periods due up to date and state our position on these dues and request forms from you for the rebate on the previously paid amount.
We will also make an estimate of such portion of our ballroom liquor revenue as applied to the public during the portion of last year when we advertised and were open to the public.
We believe here too, that such a small part of our business came from the public, (regardless of our advertising) that our charge accounts to members will show that to all intents and purposes we were a private club at all times.
However, we will be glad to let you see any figures you wish and get this matter settled to your satisfaction.
I must take personal blame for failure to make any reports that should have been made under these circumstances.
(b) Plaintiff wrote the aforesaid letter on his own typewriter. The Internal Eevenue Agent helped him formulate it.
(c) Plaintiff subsequently has affirmed that the statements contained in the letter are true.
*1213 (95. For the third quarter of 1959 a cabaret tax was assessed against “A. S. Epstein doing business as Club Del Mar”. At that time plaintiff opened the ballroom, advertised for customers, and hired the Russ Morgan band. Plaintiff shortly thereafter discontinued this “open to the public” policy in the Club Del Mar ballroom because it was not remunerative. In explanation of late filing of the cabaret tax return and in claiming the delay “was not due to willful intent to avoid compliance with the requirements of the Internal Revenue Code”, plaintiff wrote the Internal Revenue Service on December 12,1960:
Since the Del Mar Club was a private dub it did not appear to me that sales during the period [July, August and September of 1959] which were partly open to the public were subject to cabaret tax.
96. Also on December 12,1960 plaintiff signed and sent the following letter to the Director of Internal Revenue, Los Angeles, California, which letter was prepared by his accountant :
Subject: Club dues tax.
I am submitting herewith a signed tax return form 720 disclosing Club dues tax in the amount of $70,076.06 covering the period January 1st 1959 thru October 31st, 1960 which tax has been collected by me from members of the Club Del Mar.
I am attaching hereto my check drawn in your favor in the amount of $2500.00 on part payment against the above liability.
I would appreciate if (sic) an arrangement could be made for payment as follows:
I will send you an additional $2,000 on the first and 15th of each month commencing with January 1st.
I would suggest that about June 1st 1961 we could sit down for a further review which may permit me to pay the then balance in full.
The above is respectfully submitted for your consideration, and it is understood that this has not been an agreement between the Internal Revenue Service and myself for liquidating the above.
97. Plaintiff’s proposed arrangement for payment was not accepted. Instead he paid $6,060.04 and $10,497.05 in Sep *1214 tember 1901, $5,000 a month in October, November and December of 1961, January, February, March and April of 1962, and paid $23,097.36 in May 1962. See finding 1.
•98. Plaintiff does not allege, and the evidence does not show, that he, either individually or in his capacity of doing business as Club Del Mar, has made a refund to the club members or has obtained the consent of the members to the allowance of the refund sought in this suit.
Ultímate Findings
99. The Club Del Mar’s members were afforded opportunity to. associate together for the common purpose of using and enjoying the club’s facilities and participating in its social, recreational and athletic activities; there was substantial commingling among members in these respects; the members made themselves subject to rules and regulations in their conduct and use of the club’s facilities; they could use the club’s facilities for as many or as few times as they wished for an initiation fee, prescribed monthly dues and annual locker rentals; and they composed a group distinct and apart from the general public in these various respects.
100. The Club Del Mar was a “club or organization” within the meaning of section 4241 of the Internal Kevenue Code of 1954.
101. The social activities of the Club Del Mar, such as dances, parties, family dinners, fashion shows, athletic competitions, etc., were a prominent and material feature of its activities. Such social activities tended to make membership therein more desirable; they were also used for and were of substantial assistance in attracting new members.
102. The Club Del Mar was a “social, athletic, or sporting club or organization” within the meaning of section 4241 of the Code.
■ 103. Plaintiff has failed to show that he bore the economic burden of the tax.
Conclusion op Law
On the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of *1215 law, that plaintiff is not entitled to recover, and his petition is dismissed.

 Section 4242(a) defines the term "dues” to include “any assessment, irrespective of the purpose for which made, and any charges for social privileges or facilities, or for golf, tennis, polo, swimming, or other athletic or sporting privileges or facilities, for any period of more than six days * *

 Pursuant to sections 4241(b) and 4291, the taxes Imposed by the sections are required to be paid by the member to the club or organization which, in turn, Is obligated to pay such taxes over to the Government.

 That section provides in part that “refund of any overpayment of tax imposed by section * * * 4241 may be allowed to the person who collected the tax and paid it to the Secretary * * * if such person establishes, under such regulations as the Secretary * * * may prescribe, that he has repaid the amount of such tax to the person from whom he collected it, or obtains the consent of such person to the allowance of such * * * refund.”

 The dues tax Is an excise tax Imposed upon a payment made “for the right to repeated and general use of a common club facility for an appreciable period of time * * »” White v. -Winchester Country Club, 315 U.S. 32, 41 (1942). See also Congressional Country Club v. United States, 71 Ct. Cl. 161, 44 F. 2d 266 (1930). Since the term “dues” is defined by the Code to include “any charge for social privileges or facilities » * * for more than six days”, amounts paid for locker rental are included. Knoll Golf Club v. United States, 179 F. Supp. 377 (D.N.J., 1959); Cohan v. United States, 198 F. Supp. 591 (E.D. Mich., 1961); Hoke v. United States, 215 F. Supp. 942 (S.D. W. Va., 1963).

 That section exempts from income tax “Clubs organized and operated exclusively for pleasure, recreation and other non-profitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder.” TJnder a 1943 Internal Revenue Service ruling, the term “clubs” as used in a predecessor section was deemed to be used in the same sense as the term “club” in the dues tax section so that to constitute a “club” “* * * at least there must be some sort of association or cooperation between the members, in an effort to reach some common objective before we may consider that there is a club or organization * * *” G.C.M., 23688, 1943-Cum. Bull. 283, 286-87. Under a later ruling, a non-profit club exempt from income tax was considered to be “a social, athletic, or sporting club or organization” for purposes. of the excise tax on dues. Rev. Rul. 56-334, 1956-2 Cum. Bull. 831. It, of course, does not follow from these rulings that membership dues in a dub subject to income tax are ipso facto exempt from the dues tax. See Engineers’ Club of Los Angeles v. United States, 173 F. Supp. 934, 936 (S.D. Cal., 1959).

 In Sham the facility was largely operated by a single individual who, among other things, usually passed on applications for membership and appointed members of various committees, all of which committees did not function regularly. No formal general or special membership meetings were held and the members had no voice in the dues. The court held that despite the fact that the club was run in a very informal manner, that the by-laws were not strictly adhered to, and that the members were primarily interested in the golfing and social activities, plaintiff had failed to meet the burden of proof of showing that it was not a bona fide club.

 In 1958 and 1959 legislation was adopted adding as section 4243(b) of the Code a provision exempting any amount paid as dues or membership fees or as initiation fees for the construction or reconstruction of any social, athletic or sporting facility or capital addition or improvement thereto. 72 Stat. 1288; 73 Stat. 618. The legislative history of these enactments indicates they were not intended to be applicable to “charges which go to the upkeep and operation of social, athletic or sporting clubs” and such charges “continue to be taxable.” See 1958-3 Cum. Bull. 372, 412, 584, 627-28. Another modification in 1959 was to limit the exemption to sums actually expended within three years after payment by the member, the unexpended balance to be subject to the tax upon the expiration of that period, with the tax payable on such unexpended balance by “the club or organization, rather than the person who made such payment * * *.” Plaintiff argues that when Congress exempted all payments by the members earmarked for capital additions and improvements and continued taxability of charges which go to upkeep and operation, the assumption was necessary that the clubs within the scope of the tax were member-financed on the basis that it would make no sense to say that payments by members are for capital additions which they could not own or control. But there is nothing in the statute or in the legislative history to indicate that in adopting these amendments Congress intended any departure from the long-standing principle that the dues tax was applicable to profit as well as non-profit clubs or organizations. It may be noted in passing that as of December 1960 the Club Del Mar’s bills to members specifi *1171 cally stipulated that the amount paid thereon "will be used in its entirety to repay loans and reimburse reserve funds used for construction, furnishings, etc., pursuant to section 42.43 of the Internal Revenue Code, until such repayment and reimbursement is complete.”

 E.g., Chemists’ Club v. United States, 64 Ct. Cl. 156 (1927); Army & Navy Club v. United States, 72 Ct. Cl. 684, 53 F. 2d 277 (1931), cert. denied, 285 U.S. 548 (1932); Houston Club v. United States, 74 Ct. Cl. 640, 58 F. 2d 487 (1932); Union League Club v. United States, 78 Ct. Cl. 351, 4 F. Supp. 929 (1933); University Club v. United States, 79 Ct. Cl. 780, 6 F. Supp. 129 (1934); Whitehall Lunch Club v. United States, 80 Ct. Cl. 350, 9 F. Supp. 132 (1934); Chicago Engineers’ Club v. United States, 80 Ct. Cl. 615, 9 F. Supp. 680 (1935); Century Club v. United States, 81 Ct. Cl. 878, 12 F. Supp. 617 (1935); Transportation Club of San Francisco v. United States, 84 Ct. Cl. 253, 17 F. Supp. 201 (1936); The Merchants Club v. United States, 106 Ct. Cl. 562, 66 F. Supp. 126 (1946); Bankers Club v. United States, 115 Ct. Cl. 50, 87 F. Supp. 253 (1949) ; Drug & Chemical Club of New York v. United States, 115 Ct. Cl. 66 (1949), cert. denied 340 U.S. 810 (1950); Railroad-Machinery Club of New York v. United States, 118 Ct. Cl. 542, 95 F. Supp. 822 (1951).

 Treasury Regulations on Excise Taxes (1954 Code) § 49.4241-1.

 No infringement of due process is involved in this restriction. “If the taxpayer has borne the burden of the tax, he can readily show it; and certainly there is nothing arbitrary in requiring that he make such a showing. If he has shifted the burden to the purchasers, they and not he have been the actual sufferers and are the real parties in interest * * United States v. Jefferson Electric Co., 291 U.S. 386, 402 (1934).

 üp to the end of June 1959 the annual rental fee for a locker was $20.00 rather than $24.00.

 Cf. finding IT.